UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

| RONALD MAZZACONE, | ) |  |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | CAUSE NO.: 3:13-CV-897-TLS |
| TYSON FRESH MEATS, INC., and TYSON FOODS, INC., | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

The Plaintiff, Ronald Mazzacone, is suing his former employer, Tyson Fresh Meats, Inc. and Tyson Foods, Inc. (collectively, Defendants) under the Americans with Disabilities Act (the ADA) for a failure to accommodate his disability and per se discrimination based on a 100% healed policy.[1] The Defendants have filed a Motion for Summary Judgment [ECF No. 23]. For the reasons stated in this Opinion and Order, the Court denies the Defendants' Motion.

**BACKGROUND**

The Defendants are producers of chicken, beef, and pork products throughout the United States. The Plaintiff began working at the Defendants' pork production plant in Logansport, Indiana, in June 2008. He was hired as a "No Jobber" (or "Laborer"), a position that entails floating between various departments to provide support as needed.

---

[1] To the extent the Plaintiff's Complaint [ECF No. 1] raises a claim of discrimination under the ADA, such a claim has been waived. *See Sanders v. Vill. of Dixmoor, Ill.*, 178 F.3d 869, 870 (7th Cir. 1999) (finding that the plaintiff waived a Title VII claim after he failed to address the claim when responding to the defendant's summary judgment motion).

**A.      Slip-and-Fall Incident**

In early 2010, the Plaintiff was placed in a position called "Manifest on Kill Floor," which entails separating four different parts of the hog and placing them (along with dry ice) into boxes. The Plaintiff claims that on August 6, 2010, while attempting to fill a 50-gallon barrel with dry ice, he slipped, fell, and sustained injuries to his neck and lower back. As a result, the Defendants granted the Plaintiff a leave of absence until September 14, 2010.[2]

Upon his return to work, the Plaintiff was placed in several light-duty positions, including positions called "Pick Lean" (the separation of fat from small pieces of meat) and "Monitor Fecal" (the inspection of hogs for fecal material). The Plaintiff testified that he could not perform either position due to his neck injury; so therefore, he was placed in a "freezer" position. (Pl.'s Dep. 86.) However, after only three hours at the freezer position, he allegedly fell to the floor and was carried upstairs to the head supervisor. According to the Plaintiff, the head supervisor assigned him to a variety of "Monitor" positions (i.e., the monitoring of a dock, elevator, trolley room, and other locations), which the Plaintiff performed for roughly two months.

In November 2010, the Plaintiff's physician, Dr. John Gorup (orthopaedic surgeon) informed the Plaintiff that his neck injury required surgery. The Plaintiff agreed to the surgery and requested another leave of absence on November 11, 2010. The Defendants granted the request, but denied that the Plaintiff's neck injury was related to the slip-and-fall incident on

---

[2]The Defendants' written employment policy permits employees to take up to one year of unpaid leave for both work-related and non work-related medical conditions. The policy also permits the termination of employment if an employee fails to return to work or fails to obtain an extension for leave prior to its expiration. Leave may be extended beyond one year if the employee provides medical documentation to justify additional leave.

August 6, 2010.

B. **Requests for Light-Duty Work**

During the Plaintiff's leave of absence—which began on November 23, 2010, and ended upon his termination in December 2011—he provided the Defendants with a monthly certification (i.e., the Defendants' "Return to Work Certification") signed by his medical provider, as required by the Defendants' written employment policy. Each certification contained the following question:

> Is the Team Member able to return to work and meet the attendance standards and perform the functions on the attached description without posing a significant risk of substantial harm to the Team Members or others?[3]

*See, e.g.*, Return to Work Certification, Feb. 3, 2011, ECF No. 25-2 at 9. On certifications dated January 3 and February 3, 2011, Dr. Gorup answered "no" to the above question; and on a certification dated February 24, 2011, Dr. Michael Highhouse (orthopaedic surgeon) also answered "no." After receiving each certification, the Defendants extended the Plaintiff's leave of absence.

However, on the next certification, dated March 11, 2011, Dr. Gorup indicated that the Plaintiff could return to work on March 14, 2011, with the following restrictions: "no pushing or pulling and no lifting over 5 lbs with left arm."[4] (ECF No. 26-2 at 10.) The Plaintiff claims that on or about March 15, 2011, he delivered the certification to the Defendants; spoke with Marsha

---

[3]Although the question refers to an "attached [job] description," none of the certifications in the record include such an attachment.

[4]The Plaintiff indicates that Dr. Gorup's reference to the left arm was a mistake—the Plaintiff's restriction relates to his right arm.

Thatcher, the Assistant Complex HR Manager; and requested a return to light-duty work. Thatcher allegedly informed the Plaintiff that she was told by Kelly Robertson, Sr., the Human Resources Manager, that "light-duty work is only for people who got hurt on the job, and since [the Plaintiff's neck injury] is not job related," no light-duty position is available. (Pl.'s Dep. 167.) Thatcher then informed the Plaintiff that unless he could perform a "full-duty job," he could not return to work. (*Id.* at 168.) The Defendants proceeded to extend the Plaintiff's leave of absence until May 5, 2011.

According to the Plaintiff, he had a second conversation with Thatcher in April 2011. When the Plaintiff inquired whether any light-duty jobs were available, Thatcher responded, "I told you last month that . . . Robertson said you're not getting light-duty work. You didn't get hurt here. You have to come back to work ready to do a full-time job." (*Id.* at 182.) The Plaintiff explained to Thatcher that he was without health insurance and was having difficulty finding a doctor to evaluate him.[5] The Plaintiff claims that, during the meeting, Thatcher informed him that his leave would not be extended past one year.

Then, on May 5, 2011, Dr. Gorup signed and submitted a certification for the Plaintiff—only this time, it indicated that the Plaintiff could not return to work. The Plaintiff said he received no treatment from March 11, 2011, through May 5, 2011; and did not request the certification from Dr. Gorup. The Plaintiff testified in his deposition that he believed the Defendants requested the certification from Dr. Gorup. (*Id.* at 185–86 ("[Counsel:] Did Marsha Thatcher ever tell you that she called Dr. Gorup's office to request [the May 5 certification]?

---

[5]The Plaintiff testified that, by this time, he had stopped seeing Drs. Gorup and Highhouse. *See* Pl.'s Dep. 169 ("I was done seeing Dr. Gorup. He said he'd done all that he could. Plus, I couldn't pay this Highhouse guy. I was going to have to find some specialist that would take me somehow and see what he could do with me.").

4

[Plaintiff:] For some reason I'm going to say yes, she did. I believe that's why that's the last time she ever saw me, and Kelly Robertson took over from there.").) The Defendants extended the Plaintiff's leave of absence through June 9, 2011.

In June 2011, the Plaintiff allegedly met with another female employee of the Defendants (who he was unable to identify by name). The Plaintiff said he informed the employee that he found a new doctor, Dr. Leny Philip (internal medicine physician), but was unable to see Dr. Philip until July. Dr. Philip conducted an evaluation of the Plaintiff in July (and again in August), and determined that the Plaintiff was unable to return to work. This resulted in additional extensions of the Plaintiff's leave of absence through September 1, 2011.

During this time, the Plaintiff met with Robertson and asked if any light-duty work was available, to which Robertson allegedly responded, "You'll. Never. Get. Light. Duty . . . If you want to come back, you know what [the work certification must] say. We've told you every month." (*Id.* at 206.) Dr. Philip submitted two additional certifications on October 3 and November 2, 2011, both representing that the Plaintiff was unable to return to work; and the Defendants extended the Plaintiff's leave of absence through November 28, 2011.

C.  **Termination**

In a letter dated November 10, 2011, the Defendants informed the Plaintiff that, pursuant to their written employment policy, his leave of absence would expire on November 28, 2011, and that he must "provide a return to work certification from [his] health care provider confirming that [he is] able to perform the essential functions of [his] position." (ECF No. 25-2 at 27.) The Defendants warned that a failure to provide the updated medical documentation or

contact them within two weeks would lead to termination.

On or about December 5, 2011, the Plaintiff met with Robertson and presented a certification, dated December 1, 2011, in which Dr. Philip indicated that the Plaintiff was able to return to work with the following restrictions: no stretching of his right arm and shoulder, and no lifting of more than 20 pounds. (ECF No. 26-3 at 13.) At his deposition, Robertson said he informed the Plaintiff that, based on the restrictions articulated by Dr. Philip, he could perform his full-time job (i.e., "Manifest on Kill Floor") because the job did not require him to reach above the shoulder. But according to Robertson, the Plaintiff expressed doubt that he could perform the job because it may "hurt his arm." (Robertson Dep. 27.) The Plaintiff then allegedly told Robertson that he would get back to him after he attended a doctor's appointment scheduled for that day.

The Plaintiff, however, offered a contrasting version of the above events:

[Counsel:] And when you gave [Robertson] the return to work [certification] from Dr. Philip [on December 5, 2011], what did he say?
[Plaintiff:] "Vague. Vague. That's too vague. I need specifics. Your arm. Your leg. Your back. Everything. I need more specific clarification of this. This is much too vague," he said.
[Counsel:] What did you say?
[Plaintiff:] "Give me another [certification], and I'll go back and see [Dr. Philip] again next week."

\*     \*     \*

[Counsel:] Did you and Kelly Robertson have any other conversation . . . [or] talk about anything else?
[Plaintiff:] Well, just that I needed to do this as quick as I could and get it back there because, "You know, your time is up already. I'm going to extend [your leave of absence] for a few more weeks just so you can get this clarified, but that's it. You're not getting any more time."

(Pl.'s Dep. 240–41.) The Plaintiff testified that he went back to Dr. Phillip, who said he

6

would fax an updated certification to the Defendants.

Then, on December 19, 2011, Robertson reportedly sent a letter to the Plaintiff, which stated in relevant part:

> On 11/10/2011 I sent you notice that your approved [leave of absence] was to expire on 11/28/2011. You were asked to contact me to discuss your status and/or provide me with updated medical information and that failure to do so would result in the termination of your employment with Tyson Foods. You did contact me and we began an interactive process to determine if the company would be able to accommodate the restrictions requested by your physician listed as:
>
> 1. No lifting more than 20 lbs.
> 2. No extension of right arm.
>
> As of 12/6/2011, you were notified that the company would accommodate these restrictions; however, you stated you were returning to the doctor on that day. You have failed to contact us further. Because you have failed to contact me further, you have been terminated from Tyson's payroll; however, if there was some reason or special circumstances that prevented you from contacting me prior to this date, please call me.

(ECF No. 25-2 at 29 (slight modifications made for clarity).) According to Robertson, he received no further communication from the Plaintiff or Dr. Philip regarding the Plaintiff's work restrictions.

The Plaintiff, on the other hand, testified that he never received the December 19 letter. He also testified, contrary to Robertson's testimony, that he and Robertson had four additional communications in December 2011 (two telephone conversations and two additional meetings). In the first telephone conversation, which he maintains occurred after December 19, 2011, the Plaintiff informed Robertson that Dr. Philip was planning to submit a revised certification, prompting Robertson to give him "'another day or two.'" (Pl.'s Dep. 243.) Then, in a second telephone conversation, Robertson allegedly informed the Plaintiff that he received Dr. Philip's revised certification, and that he needed to speak to the Plaintiff in person. According to the

Plaintiff, the parties met, and Robertson stated that the certification "'isn't telling me anything'" and "'I'm going to have to let you go if you can't get more specific.'" (*Id.* at 247.) The Plaintiff said that Dr. Philip submitted (and Robertson received) another revised certification. The parties met a final time on December 22, and according to the Plaintiff, he was terminated "[the] minute" he arrived. (*Id.* at 250.)

**D.     Procedural Background**

On June 14, 2012, the Plaintiff filed a Charge of Discrimination against the Defendants with the Indiana Civil Rights Commission (ICRC) and the Equal Employment Opportunity Commission (EEOC). Notably, just a few months after filing the Charge of Discrimination, the Plaintiff suffered a heart attack. Then, on August 27, 2012, the Plaintiff filed an application for Social Security Disability; which was approved on August 23, 2013. The Social Security Administration determined that the Plaintiff became disabled on August 6, 2010, the date of his slip-and-fall incident.

On May 31, 2013, the EEOC issued the Plaintiff a Dismissal and Notice of Rights as to his Charge of Discrimination; and on August 27, 2013, the Plaintiff filed this action against the Defendants. On April 23, 2015, the Defendants filed a Motion for Summary Judgment [ECF No. 23], along with a Brief [ECF No. 24] and Designation of Evidence in Support of the Motion [ECF 25]. On May 21, 2015, the Plaintiff filed a Response [ECF No. 26] and a Motion Seeking Permission to File His Brief in Response in Excess of 25 Pages [ECF No. 27]; and on June 8, 2015, the Defendants filed a Reply [ECF No. 28]. These matters are now fully briefed and ripe

for ruling.⁶

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is the moment in litigation where the nonmoving party is required to marshal and present the court with evidence on which a reasonable jury could rely to find in his favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). A court should only deny a motion for summary judgment when the nonmoving party presents admissible evidence that creates a genuine issue of material fact. *Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011) (citing *United States v. 5443 Suffield Terrace*, 607 F.3d 504, 510 (7th Cir. 2010); *Swearnigen–El v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 852, 859 (7th Cir. 2010)). Material facts are those that are outcome determinative under the applicable law. *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). Although a bare contention that an issue of material fact exists is insufficient to create a factual dispute, a court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *see Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

---

⁶Because of the fact-intensive nature of the Plaintiff's ADA claims, coupled with the Defendants' lack of objection, the Plaintiff's Motion Seeking Permission to File His Brief in Response in Excess of 25 Pages [ECF No. 27] is granted pursuant to Northern District of Indiana Local Rule 7-1(e)(2).

**ANALYSIS**

To prevail on a failure to accommodate claim, a plaintiff must show that (1) he is a "qualified individual with a disability"; (2) the defendant was aware of the disability; and (3) the defendant failed to reasonably accommodate the disability. *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 533 (7th Cir. 2013); *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005).

While the parties agree that the Plaintiff has a disability for which the Defendants are aware, their dispute centers upon whether the Plaintiff is a "qualified individual" and whether the Defendants failed to reasonably accommodate the Plaintiff's disability. The Plaintiff claims that he is a qualified individual because, at the time of the relevant employment decisions, he was able to perform light-duty work;[7] and that the Defendants failed to provide a reasonable accommodation after he submitted certifications indicating that he was able to return to work with restrictions.

**A.     Qualified Individual**

An individual is only "qualified" under the ADA if he is able, "with or without reasonable accommodation, [to] perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The ADA defines a "reasonable accommodation" to include:

> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
>
> (B) job restructuring, part-time or modified work schedules, *reassignment to a*

---

[7]At his deposition, the Plaintiff testified that he was unable to perform non light-duty jobs during his leave of absence that occurred from November 23, 2010, through his termination in December 2011.

> *vacant position*, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9) (emphasis added); *Jackson v. City of Chi.*, 414 F.3d 806, 811 (7th Cir. 2005). Whether the plaintiff meets the "qualified individual with a disability" definition is determined as of the time of the employment decision. *Id*. The plaintiff bears the burden of showing that he is a qualified individual with a disability in order to successfully prosecute an ADA claim. *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 524 (7th Cir. 1996) (citing *DeLuca v. Winer Indus., Inc.*, 53 F.3d 793, 797 n.3 (7th Cir. 1995)).

**1.** *Estoppel*

As an initial matter, the Defendants argue that the Plaintiff's representations before the Social Security Administration (SSA) estop him from claiming that he is a "qualified individual" under the ADA.

The Defendants note that, in his function report to the SSA, dated September 25, 2012, the Plaintiff stated that he cannot "outstretch [his] right arm and lift over head," "sit long because of shoulder/neck pain," or lift more than 10 pounds; that his right leg is "going completely numb for hours at a time"; and that he can only pay attention for two hours at a time. (Def.'s Br. 10–11.; ECF No. 25-5 at 9–16.) The Defendants also point to a sworn affidavit from Robertson, in which he testified that after "review[ing] the statements [the Plaintiff] made to the Social Security Administration in 2012 regarding his restrictions stemming from his August 6, 2010 incident . . . there were no positions at Tyson, light duty or otherwise, that would have been able to accommodate the restrictions as represented by [the Plaintiff]." (Robertson Aff. 3, ECF No.

11

25-4.)

But as the Plaintiff notes, an applicant's claim of being disabled on an SSDI application does not necessarily subject him to judicial estoppel on an ADA claim. *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 802–03 (1999) ("[D]espite the appearance of conflict that arises from the language of the two statutes, the two claims do not inherently conflict to the point where courts should apply a special negative presumption."); *see also Feldman v. Am. Mem'l Life Ins. Co.*, 196 F.3d 783, 790 (7th Cir. 1999); *Weigel v. Target Stores*, 122 F.3d 461, 468 (7th Cir. 1997). When an apparent contradiction does arise out of an earlier SSDI application, a plaintiff may avoid judicial estoppel by proffering a "sufficient explanation." *Cleveland*, 526 U.S. at 805–06 (citation and internal quotation marks omitted).

> To defeat summary judgment, [an] explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless perform the essential functions of her job, with or without reasonable accommodation.

*Id.* at 807 (internal quotation marks omitted).

Here, neither party disputes that in August 2012—prior to the Plaintiff's application for SSDI and eight months after his termination—he suffered a significant intervening medical event: a heart attack. References to the heart attack and its effect(s) on the Plaintiff's daily functioning are littered throughout his SSDI application. For example, following an independent medical examination of the Plaintiff, Dr. Robert Brewer indicated that the Plaintiff "is still in the recovery stage of an acute myocardial infarction but is working at increasing his activity. He is able to walk or stand only at intervals. He could do so with short periods of rest so he could do so within the 2 hours of an 8 hour day. He can lift only 10 lbs or more if using both hands to carry one object, however, with his right arm and hand he cannot lift alone any more than about

5 lbs." (ECF No. 25-5 at 23); *see also* Pl.'s Function Report, ECF No. 25-5 at 10 ("since my heart attack I'm having soreness in legs that prevent me from sleeping")); *id.* at 15 ("[I] always [handled stress] well until my heart attack."); *id.* at 16 ("[I'm] having a lot of problems [with] right leg going completely numb for hours at a time.").

In short, the documented effects of the Plaintiff's heart attack on his daily functioning provide a reasonable explanation for any alleged inconsistencies between the Plaintiff's representations to the SSA and his representations pursuant to his ADA claim—and as such, are enough to permit the Plaintiff to go forward with his claim that he was able to perform light-duty work at the time of the relevant employment decisions in 2011.

**2.      *Light-Duty Work***

Next, the Defendants argue that the Plaintiff is not a "qualified individual" because his proposed accommodation—reassignment to a vacant light-duty position—is not a reasonable accommodation under the ADA. *See Gratzl v. Office of Chief Judges*, 601 F.3d 674, 680 (7th Cir. 2010) ("[Because the plaintiff] bears the burden of establishing that she can perform the essential functions of her job with or without reasonable accommodation, she has not met this burden if the only accommodation she has ever suggested is not reasonable.") (internal citation and quotation marks omitted).

Indeed, an employer is not required to "manufacture a job that will enable the disabled worker to work despite his disability." *Hansen v. Henderson*, 233 F.3d 521, 523 (7th Cir. 2000). In *Dalton v. Subaru-Isuzu Auto., Inc.*, the Seventh Circuit reviewed an employer's light-duty program that provided temporary positions—normally lasting no longer than 90 days and

13

carrying with them a reduced wage—for employees suffering from temporary disabilities. 141 F.3d 667 (7th Cir. 1998). In finding that the temporary and limited nature of the program did not violate the ADA, the court noted the following:

> The ADA does not compel an employer to reduce the number of bona fide temporary jobs it has set aside . . . and to convert them to permanent positions for its disabled employees. . . To hold otherwise would be to require [an employer] to create new full-time positions to accommodate its disabled employees, a course of action not required under the ADA.

*Id.* at 680; *see also Watson v. Lithonia Lighting*, 304 F.3d 749, 752 (7th Cir. 2002) ("[T]he ADA does not require an employer that sets aside a pool of positions for recovering employees to make those positions available indefinitely to an employee whose recovery has run its course."); *cf. Gratzl*, 601 F.3d at 680 (affirming summary judgment and finding, as a matter of law, that an employer who decided to eliminate a special position the plaintiff held by incorporating it as one among many court reporter duties (which the plaintiff could not perform) did not violate the ADA because an employer is not required "to maintain an existing position or structure that, for legitimate reasons, it no longer believes appropriate").

However, in *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685 (7th Cir. 1998), an analogous case involving a class of permanently disabled employees who were denied reassignment into light-duty positions (which their employers reserved for employees recuperating from temporary medical restrictions), the Seventh Circuit reversed the district court's grant of summary judgment, finding that a question of fact existed as to whether the plaintiffs' light-duty positions were permanent or temporary. The Court noted that the light-duty positions were given "with no end-date, no specified period for

14

holding the job . . . [and] [the plaintiffs] remained in those jobs until a medical decision concerning the permanence of their disabilities was rendered." *Id.* at 697. The Court also noted that the defendant employer specifically created the light-duty positions in the applicable collective bargaining agreement and did not designate them as temporary. *Id*; *see also Lutter v. Rinella Beverage Co.*, No. 00 C 8024, 2004 WL 419826, at *12 (N.D. Ill. Feb. 5, 2004).

When viewing the evidence in a light most favorable to the Plaintiff—as the Court must for summary judgment purposes—a question of fact exists as to whether the Defendants' light-duty positions were, in fact, temporary; so as to preclude a violation under the ADA. *See Hendricks-Robinson*, 154 F.3d at 697 ("If the light-duty positions truly are temporary, [the defendant] was not required to convert them into permanent ones for the permanently restricted employees.") The record shows that the Defendants maintained light-duty positions that were "created for individuals with restrictions," (Robertson Dep. 84), and that prior to taking a leave of absence for neck surgery, the Plaintiff was placed in a variety of light-duty positions (i.e., "Pick Lean" "Monitor Fecal," and other "monitor" positions). Similar to *Hendricks-Robinson*, the light-duty positions had specific titles (and in this case, specific job codes), *see* Job Activity Notification Forms, ECF No. 26-3 at 21–28, and were given to the Plaintiff with no end-date or specified period for holding such jobs. *Cf. Dalton*, 141 F.3d at 681 (finding that a light-duty program was temporary when employee participation was limited to a maximum period of 90 days). Although it may be reasonably inferred from Robertson's testimony that the Defendants' light-duty positions are, in fact, temporary positions for

15

recovering employees, the Court is not charged with drawing such inferences. *See Payne*, 337 F.3d at 770 ("On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." ) (citing, in part, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)); *see also Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) ("On a motion for summary judgment, all doubts as to the existence of an a issue of material fact must be resolved against the movant.") (citation and internal quotation marks omitted). In the Court's view, the Plaintiff has submitted sufficient evidence to create a triable issue as to whether reassignment to a light-duty position constituted a reasonable accommodation under the ADA.[8]

### B.  Failure to Reasonably Accommodate

As part of the reasonable accommodation duty, the ADA requires employers to engage in an interactive process with disabled employees needing accommodation so that together they can

---

[8] Alternatively, the Defendants argue that the Plaintiff was not a "qualified individual" because he failed to identify a vacant light-duty position during the relevant time period. *See, e.g., Fox v. Toyota Motor Mfg., Ind., Inc.*, No. 3:07-cv-71-WGH-RLY, 2008 WL 2705555, at *4 (S.D. Ind. Jul. 10, 2008) (finding that the plaintiff is not qualified under the ADA, in part, because "[n]either [the plaintiff] herself [n]or any other witness establish that there was a particular job at the facility that did not violate [the plaintiff's] restrictions which was actually vacant . . . during the time [the Plaintiff] was on medical leave.") However, given the Plaintiff's deposition testimony—in which he essentially states that the Defendants prevented him from determining whether a light-duty position was available—this issue collapses into the inquiry as to whether the Defendants failed to reasonably accommodate the Plaintiff's disability, which the Court will address below. *See Dalton*, 141 F.3d at 678 (finding that "[t]he employer must first identify the full range of alternative positions for which the individual satisfies the employer's legitimate, nondiscriminatory prerequisites . . . and then determine whether the employee's own knowledge, skills, and abilities would enable her to perform the essential functions of any of those alternative positions, with or without reasonable accommodations." ); *see also Baert v. Euclid Beverage, Ltd.*, 149 F.3d 626, 633–34 (7th Cir. 1998) (noting that employee requested to be assigned to any open position and that there was a genuine issue whether there were open positions available that he could perform).

16

identify the employee's needs and discuss accommodation options. *Emerson v. N. States Power Co.*, 256 F.3d 506, 515 (7th Cir. 2001). "An employee's request for reasonable accommodation requires a great deal of communication between the employee and employer." *Bultemeyer v. Fort Wayne Cmty. Schs.*, 100 F.3d 1281, 1285 (7th Cir. 1996). Both parties bear responsibility for determining what accommodation is necessary. *Id*. If an employer fails to engage in the interactive process or causes the process to breakdown, and that breakdown leads to the employer's failure to provide a reasonable accommodation, the employer is liable under the ADA. *Emerson*, 256 F.3d at 515.

Here, the parties agree that on or about December 5, 2011, the Plaintiff met with Robertson and presented a certification, dated December 1, 2011, in which Dr. Philip indicated that the Plaintiff was able to return to work with the following restrictions: no stretching of his right arm and shoulder, and no lifting of more than 20 pounds. But this is where their agreement ends. In the Defendants' version of the events—as presented by Robertson's testimony—the Plaintiff was informed at the December 5 meeting that he could perform his full-time job (i.e., "Manifest on Kill Floor"). The Plaintiff then expressed doubt as to whether he could perform the job, and he was granted additional time to contact his doctor. Robertson testified that he received no further communication from the Plaintiff or Dr. Philip regarding his work restrictions prior to the Plaintiff's termination.

By contrast, in the Plaintiff's version of the facts—as presented by his own testimony—Robertson refused to discuss potential accommodations at the December 5 meeting; and instead, requested a more detailed work certification. *See* Pl.'s Dep. 240 ("[Counsel:] And when you gave [Robertson] the return to work [certification] from Dr. Philip [on December 5,

2011], what did he say? [Plaintiff:] 'Vague. Vague. That's too vague. I need specifics. Your arm. Your leg. Your back. Everything. I need more specific clarification of this. This is much too vague.'") The Plaintiff went on to testify that four additional communications took place between he and Robertson (two in-person meetings and two telephone conversations), where the parties discussed revised certifications that were submitted by Dr. Philip and ultimately rejected by Robertson. *See* Pl.'s Dep. 247 ("[Counsel:] Did you go in and see Kelly Robertson the same day as the phone call? . . . [Plaintiff:] I went in that day. He said, 'This [second certification] isn't telling me anything' and he was trying to discourage me. He kept saying, 'What are you we going to do? I'm going to have to let you go if you can't get more specific.'"); *id.* at 250 (testifying that during a December 22 meeting, Robertson "fired me right that minute when I came in.").

Generally, "summary judgment briefs that present different versions of the facts [should] arouse [a court's] attention given the standard under the Federal Rules of Civil Procedure." *Paz v. Wauconda Healthcare and Rehab. Ctr*, 464 F.3d 659, 664 (7th Cir. 2006); *Pourghoraishi v. Flying J*, 449 F.3d 751, 753–54 (7th Cir. 2006) ("[S]ummary judgment briefs that present multiple versions of the facts arouse our attention at the outset because under the Federal Rules of Civil Procedure, a judge may grant summary judgment for a moving party only where there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law."). As demonstrated above, the parties have presented wholly different versions of the December 5 meeting and the relevant events that occurred (or did not occur) thereafter. Aside from a copy of the December 19 letter sent by Robertson—the content of which is contradicted, in part, by Robertson's own testimony, *see* Robertson Dep. 33 ("[Counsel:] So, would you

characterize your discussions with [the Plaintiff] in December 2011 as an interactive process or didn't it get to that level? [Robertson:] I would not, no.")—the evidence as to the parties' relevant communications is limited to competing depositions. *See Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) ("[B]ecause summary judgment is not a paper trial, the district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial."); *see also Paz*, 464 F.3d at 664 ("[A] plaintiff may defeat summary judgment with his or her own deposition.").

At this point in the litigation, the Court cannot declare, as a matter of law, that no reasonable juror could find in the Plaintiff's favor as to whether the Defendants failed to provide him a reasonable accommodation. If the Plaintiff's testimony is deemed credible, a reasonable jury may conclude that the Defendants either failed to engage in the interactive process or were responsible for any breakdown in communications between the parties, and that such actions resulted in the denial of a reasonable accommodation (i.e., reassignment to a light-duty position). For these reasons, summary judgment is inappropriate on this case record.

## C.     100% Healed Policy

Lastly, a material issue of fact also exists as to whether the Defendants applied a "100% healed policy," which constitutes a per se violation of the ADA because it "prevents individual assessment . . . [and] necessarily operates to exclude disabled people that are qualified to work." *Steffen v. Donahoe*, 680 F.3d 738, 748 (7th Cir. 2012) (citing *Powers v. USF Holland, Inc.*, 667

19

F.3d 815, 819 (7th Cir. 2011) ("[A]ll courts agree that a 100% rule is impermissible as to a disabled person.") (citation and internal quotation marks omitted).

The Plaintiff testified that beginning in March 2011, he had multiple conversations with employees of the Defendants where he was informed that he could not return to work unless he could perform a "full-time" or "full-duty" job. *See, e.g.*, Pl.'s Dep. 167–68 (testifying that Thatcher, after receiving a work certification signed by Dr. Gorup indicating that the Plaintiff could return to work with restrictions, informed the Plaintiff that unless he can perform a "full-duty job," he cannot return to work.). Again, in light of this case record—which consists largely of the competing depositions of Robertson and the Plaintiff—the Court cannot declare, as a matter of law, that no reasonable juror could find in the Plaintiff's favor. The appropriate course is for a trier of fact to weigh the Plaintiff's credibility, and determine whether the Defendants, in fact, required the Plaintiff to be cleared of all medical restrictions prior to returning to work, so as to violate the ADA's prohibition against applying a 100% healed policy.

## CONCLUSION

For the reasons stated above, the Court GRANTS the Plaintiff's Motion Seeking Permission to File His Brief in Response in Excess of 25 Pages [ECF No. 27]; and DENIES the Defendants' Motion for Summary Judgment [ECF No. 23]. The Court SETS a telephonic status/scheduling conference for March 24, 2016, at 10:00 AM. The Court will initiate the call.

SO ORDERED on February 29, 2016.

                                       s/ Theresa L. Springmann
                                       THERESA L. SPRINGMANN
                                       UNITED STATES DISTRICT COURT
                                       FORT WAYNE DIVISION